UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

**Kari A. Dornbusch,**                                    Civil No. 09-1734 (PJS/JJG)

        Plaintiff,

v.                                                                   **REPORT AND RECOMMENDATION**

**Michael J. Astrue,**
Commissioner of Social Security,

        Defendant.

---

JEANNE J. GRAHAM, United States Magistrate Judge

Plaintiff Kari Dornbusch (Dornbusch) brings this action contesting the denial of her application for disability insurance benefits (DIB) under the Social Security Act.  *See* 42 U.S.C. § 405(g).  Dornbusch is represented by Neut Strandemo, Esq.  The Commissioner is represented by Lonnie F. Bryan, Assistant U.S. Attorney.  The parties brought cross-motions for summary judgment, (Doc. Nos. 8 and 10), which were referred to the undersigned for a report and recommendation in accordance with 28 U.S.C. § 636 and D.Minn. L.R. 72.1(a).  For the reasons set forth below, the Court recommends that Plaintiff's motion be denied, and Defendant's motion be granted.

## I.    BACKGROUND

Dornbusch protectively filed an application for disability insurance benefits on October 13, 2004, alleging a disability onset date of July 15, 2002.  (Tr. 97-99.)  She alleged disability from atypical multiple sclerosis, with symptoms of difficulty walking, leg heaviness, lack of balance, and weakness.  (Tr. at 102-03.)  Dornbusch testified at a hearing before an ALJ, and the ALJ issued an unfavorable decision on October 23, 2007.

(Tr. at 607-647, 12-36.)  The Appeals Council denied review, and Dornbusch filed this action for judicial review on July 7, 2009.  (Tr. at 6-9.)

The medical records begin on February 24, 2002, when Dornbusch was treated in a hospital for abdominal pain.  (Tr. at 225-26.)  She reported that her pain sometimes paralyzed her legs, and she wondered if the pain was in her back.  (Tr. at 225.)  Examination was normal, but a CT scan suggested a central disc protrusion at L5-S1. (Tr. at 225-27.)

A few weeks later, Dornbusch was evaluated for physical therapy.  (Tr. at 215-16.)  She reported that she worked as a hair stylist, but was off work per a physician. (Tr. at 215.)  She reported low back pain that was only relieved by medication and changing position.  (Tr. at 215.)  She had an MRI of her lumbar spine that indicated a small central disc protrusion at L5-S1 without neurologic compression.  (Tr. at 210-11.) Dornbusch also had an MRI of the pelvis, which indicated uterine enlargement with diffuse adenomyosis, and enlarging left ovarian cyst, for which she was treated. (Tr. at 212, 259-60.)

In June, Dornbusch saw her primary care physician, Dr. Daniel Larkin at Rice Street Clinic, for a possible hernia and tailbone pain.  (Tr. at 350-51.)  Dr. Larkin could not detect a hernia, and there was no evidence of fracture of the tailbone on CT scan. (Tr. at 207-08.)  Several weeks later, Dornbusch's symptoms were stomach pain, back pain radiating down her legs, tailbone pain, and nausea.  (Tr. at 348.) Dr. Larkin diagnosed probable gastritis from overuse of Ibuprofen.  (Tr. at 348.)

On July 22, 2002, Dornbusch had a negative MRI of her thoracic spine after complaining of weakness and low back pain.  (Tr. at 204.)  She also had an MRI of her

head due to her complaints of eye and facial numbness, headaches, and blurred vision. (Tr. at 205.)  The MRI showed non-specific white matter changes, indicating the possibility of demyelinating disease, vasculitis, or Lyme disease.  (Tr. at 205.)

Then, on October 23, 2002, Dornbusch went to an emergency room with a four day history of pain and numbness around her left eye, some blurred vision, and spasms, pain and numbness in her legs at night.  (Tr. at 198.)  Dornbusch also reported that over the past year she felt off-balance and had fallen.  (Tr. at 198.)  Dornbusch's other symptoms were constipation, nausea, and intermittent headaches.  (Tr. at 198.) Dornbusch was concerned that she might have multiple sclerosis.  (Tr. at 198.)  Her examination was normal, and she did not appear to be in distress, but she was referred to a neurologist, Dr. Kenneth Hoj.  (Tr. at 199, 297-99.)

Dr. Hoj noted Dornbusch's physical examination was normal, with the exception of "slight alteration, more on the soles of her feet, more so on the left compared to the right, to light touch," and "some sensory level changes at approximately T6-T7 level on her truck (sic.)."  (Tr. at 298.)  Dornbusch had an MRI of her head in November, and it showed no evidence of intracranial demyelinating disease.  (Tr. at 195-96.)  MRIs of her cervical and thoracic spine were also negative.  (Tr. at 300-01.)

To treat her chronic pelvic pain, Dornbusch had a hysterectomy in January 2003. (Tr. at 237-41.)  The next month, Dornbusch reported to Dr. Larkin that she had tailbone and leg pain, and had been falling at work because her legs gave out.  (Tr. at 347.)  She also complained of severe pain keeping her up at night.  (Tr. at 347.)  Dornbusch reported she could not sit through a movie, and was scarcely able to get out of bed in the daytime.

(Tr. at 347.)  Dr. Larkin noted that Dornbusch was very emotional.  (Tr. at 347.)  Upon examination, he stated, "[o]f note, she was able to sit through the whole exam."

On February 14, 2003, Dornbusch had a whole body bone scan to evaluate tailbone and leg pain, but the results were normal.  (Tr. at 287.)  Five days later, Dornbusch was admitted to a hospital with complaints of significant abdominal pain, with low back pain radiating into her legs, and episodes of weakness and fatigue. (Tr. at 243.)  Laboratory and radiology tests did not indicate the cause of Dornbusch's complaints, and she was discharged on February 25.  (Tr. at 245-47.)  In March, Dornbusch reported feeling a little better, but she still noticed, "some discomfort more in the tailbone region."  (Tr. at 294.)

When Dornbusch saw Dr. Larkin on June 3, 2003, she had been feeling great for three months, and looked energetic and healthy.  (Tr. at 346.)  However, over the last week, she was having muscle aches, back aches and stomach distress.  (Tr. at 346.) Dornbusch had discovered mold in her apartment, so she was tested for toxin exposure. (Tr. at 346.)  About two weeks later, Dornbusch felt fatigued and continued to have leg aches.  (Tr. at 345.)  Dr. Larkin noted she was in no distress, and she looked healthy. (Tr. at 345.)

At the end of December 2003, Dornbusch was seen in Urgent Care for right leg discomfort with numbness and heaviness.  (Tr. at 278-79.)  She reported a history of such symptoms, which would usually go away in a couple days.  (Tr. at 278.)  On examination, she was in no acute distress, and was able to walk with minimal favoring of the right leg.  (Tr. at 278.)  Dornbusch saw Dr. Larkin a few days later, and reported a right-sided burning sensation and numbness in the legs, arms, and face.  (Tr. at 344.)

Dr. Larkin noted Dornbusch was in no distress, and examination was normal with the exception of "slightly decreased sensation in the right leg compared to the left." (Tr. at 344.)  He started Dornbusch on corticosteroids.  (Tr. at 344.)

Dornbusch had an MRI of her brain on January 2, 2004. (Tr. at 317-18.) Dr. Robert Weinmann, the interpreting physician, stated that the MRI indicated "subtle areas of abnormal-signal in the white matter of the parietal lobes bilaterally.  Although nonspecific, this may represent an unusual manifestation of demyelinating disease such as multiple sclerosis."  (Tr. at 318.)

Two weeks later, Dr. Charles Ormiston of Neurological Associates of St. Paul wrote to Dr. Larkin, and stated that he did not think there was any sign of M.S. on Dornbusch's MRI.  (Tr. at 293.)  Dr. Ormiston opined, "[m]y sense is that she is hypersensitive, that she would benefit from serotonin adjustment. . . ."  (Tr. at 293.) Dornbusch saw Dr. Larkin on January 29, 2004, and reported continued symptoms of right leg pain and paresthesias, which were relieved somewhat by Prednisone and Darvocet.  (Tr. at 342.)

On April 14, 2004, Dornbusch again complained of headache, right leg pain and tingling.  (Tr. at 343.)  Her headache was responsive to Imitrex.  (Tr. at 343.)  Dornbusch also appeared to have an allergy to mold, and reported some of her symptoms of paresthesias, fatigue and pain cleared up after she moved out of her house.  (Tr. at 343.) Two weeks later, Dornbusch had worsening low back pain.  (Tr. at 340-41.)  Dr. Larkin prescribed Prednisone and Darvocet, and recommended that Dornbusch follow up at Britton Center for evaluation and treatment of fibromyalgia. (Tr. 340-41.)  He noted that

she continued to work part-time as a hair stylist, and did not want to take an anti-depressant, although she recently had a stressful living situation.  (Tr. 340.)

Dornbusch saw Dr. Larkin again for tailbone and leg pain on September 14, 2004, and she rated her pain as moderate.  (Tr. at 332.)  Dr. Larkin recommended an MRI, which showed no significant change.  (Tr. at 332, 308.)  The interpreting physician, Dr. Vladimir Savcenko, stated "[t]hese findings are nonspecific, as noted previously, unusual presentation of demyelinating disorder cannot be completely excluded." (Tr. at 308.)

Dornbusch followed up with Dr. Larkin on October 22, 2004.  (Tr. at 330.) Dr. Larkin stated, "she has recently used steroid, which consistently help with her pain complaint." (Tr. 330.)  About a week later, Dornbusch reported occasional pain in her legs and some discomfort in her tailbone.  (Tr. 329.)  Dr. Larkin noted, "she has mild demyelinating disease."  (Tr. at 329.)

Dornbusch next saw Dr. Larkin on December 7, 2004, and complained of debilitating pain in her legs and back.  (Tr. at 327.)  Dr. Larkin noted that Dornbusch had seen a specialist who was "fairly confident" that she had multiple sclerosis.  (Tr. at 327.) Her neurological examination was normal with the exception of "a couple of beats of clonus bilaterally with testing at the ankles."  (Tr. at 327.)  Dornbusch requested a disability letter.  (Tr. at 327.)  Dr. Larkin opined that Dornbusch was completely disabled from weakness, paresthesias, pain, intolerance of fumes, inability to safely handle clippers for cutting hair, inability to stand for more than five to ten minutes without her legs giving out, and constant moderate to severe pain.  (Tr. 327.)

On December 21, 2004, Dr. Larkin wrote a letter "To Whom It May Concern."

(Tr. at 319.)  He wrote:

> I am the primary physician of Ms. Kari Dornbusch.  Kari has struggled with chronic debilitating back pain, paresthesias, and depressions secondary to her physical condition.  Over the past two years, Kari has been essentially unable to carry out her usual work activity as a hairdresser due to pain in her legs, back, and neck region as well as poor coordination of her upper extremities secondary to her physical condition.  It is my recommendation that the current time she will be placed on complete disability based on her physical problems, low back, leg pain, upper back, neck pain, and due to her mental condition of depression.

(Tr. at 319.)

On January 4, 2005, Dornbusch was evaluated by Dr. Vladimir Slutsker at Britton Center for complaints of low back pain with radiation to both legs, and numbness and tingling in the legs.  (Tr. at 408.)  Dornbusch also complained of right arm pain, weakness, headaches, fatigue, and urinary urgency and retention.  (Tr. at 408.)  On examination, Dr. Slutsker noted Dornbusch was crying and obviously depressed. (Tr. at 408.)  She exhibited "significant muscle spasms in the lumbosacral areas, more on the right" and "some right side weakness, more in the right arm," but sensory examination was normal.  (Tr. at 408.)  Dr. Slutsker diagnosed chronic pain syndrome, possible multiple sclerosis, and depression.  (Tr. at 408-09.)  He gave Dornbusch samples of Cymbalta and Lidoderm patches.  (Tr. at 409.)

On February 3, 2005, Dornbusch was evaluated for urinary retention and incontinence symptoms.  (Tr. at 403-07.)  She also complained of pain, tingling and numbness in the right lower extremity.  (Tr. at 403.)  On examination, she was in no distress, and was "quite comfortable in her chair."  (Tr. at 403.)  She did not have any

obvious muscle atrophies. (Tr. at 403.) Dr. Alex Perelman at the Britton Center indicated that Dornbusch exhibited urinary retention due to pelvic floor muscle overactivity, and that multiple sclerosis could be an underlying cause of neurogenic bladder. (Tr. at 404.)

Next, Dornbusch underwent a psychological consultative examination with Dr. Alford Karayusuf on April 20, 2005. (Tr. at 415-18.) Dr. Karayusuf noted that Dornbusch cried profusely as she described the pain and paralysis of her right leg and right arm, which had started five years ago. (Tr. at 415.) Dornbusch reported that in the past twelve months, she had four bouts of complete paralysis of both legs and weakness of her arms. (Tr. at 416.) Dornbusch reported that these bouts made her increasingly depressed, anxious and fearful of being confined to a wheelchair. (Tr. at 416.) Dornbusch reported having recurring suicidal thoughts. (Tr. at 416.) Her thoughts were always racing, and she was obsessed with the possibility of becoming paralyzed. (Tr. at 416.)

Dornbusch reported that she lived in a townhouse with her two children, aged 17 and 11. (Tr. at 416.) Her children were supportive of her, and her 17-year-old son even carried her around the house when she could not walk. (Tr. at 416.) Dornbusch had no friends or hobbies, and had the television on most of the day but didn't really watch it. (Tr. at 417.) She had nieces and nephews who checked up on her every day. (Tr. at 417.)

On mental status examination, Dr. Karayusuf opined that her intelligence was dull normal and her insight "nil." (Tr. at 417.) Dornbusch related in a tense, anxious, subdued and histrionic manner. (Tr. at 417.) Dr. Karayusuf diagnosed depression, NOS and personality disorder, NOS with dependent and histrionic features. (Tr. at 417.)

Dr. Karayusuf opined, "[s]he is able to understand, retain, and follow simple instructions. She is not able to interact effectively with fellow workers, supervisors, and the public due to her emotional lability. For these reasons, she is not able to maintain pace and persistence." (Tr. at 417.)

Dornbusch began seeing Dr. Randall T. Shapiro at the Shapiro Center for Multiple Sclerosis on June 14, 2005. (Tr. at 426-35.) Dornbusch reported that her symptoms started when she was at work in October 2000, and her legs got numb, weak, and totally gave out. (Tr. at 429.) She had symptoms again in February 2001, when she was weak, with upper extremity "klutziness," vision problems, and mild urinary issues. (Tr. at 429-30.) She reported losing use of her legs and being in a hospital for ten days in 2002. (Tr. at 430.) Her symptoms improved with Prednisone. (Tr. at 431.)

Dr. Shapiro, over the course of June 2005 through December 2006, evaluated Dornbusch using two forms: the Neurological Exam Form and the Follow Up Visit Form. The Follow Up Visit Form contains four boxes with the headings "Type of MS," "MS Diagnosis," "Timed Walk," and "Incapacity Scale." (Tr. at 421.) At the first follow up visit on June 30, 2005, in the "Type of MS" box, "probable" was checked, and in the "MS Diagnosis" box, "relapsing remitting" was checked. (Tr. at 421.) The "Type of MS" was changed to "definite" on September 19, 2005, without explanation. (Tr. at 533.)

In the "Incapacity Scale" box, the Follow Up Visit Form contains the following categories: stair climbing, ambulation, transfers, bowel function, bladder function, bathing, dressing, grooming, feeding, vision, speech & hearing, medical problems, social

role, fatigue, sexual, mood/thought and mentation. (Tr. at 526.) On all but one visit, stair climbing was rated 2 out of 4, and ambulation was rated 1 out of 4.

The Neurological Exam Form has 19 boxes with the following headings: mental status (0-4); speech (0-4); extra ocular; nystagmus assessment; ambulation, muscle tone (1-4); coordination R-L (0-4); afferent defect; optic discs R-L (0-4); INO assessment; reflexes, R-L (0-4), gait (0-4), Kurtzke Functional; Romberg; tandem gait; station impair; vibration sense; muscle weakness, and Extended Kurtzke. (Tr. at 433-34.) The Kurtzke Functional box contains the following categories: pyramidal, cerebellar, brainstem, sensory, bowel & bladder, visual, mental and other. (Tr. at 434.) Dr. Shapiro never rated any category in the Kurtzke Functional box higher than 2 with the following exceptions: June 14, 2005 – bowel & bladder rated 3; June 30, 2005 - sensory rated 3; November 17, 2005 – sensory and mental rated 3. (Tr. at 424, 434, 523.)

The "Extended Kurtzke" box contains an "EDSS" score. (Tr. at 434.) The EDSS [Expanded Disability Status Scale] scores indicate the following:

> 0.0: normal neurological exam; 1.0: no disability, but minimal signs in one functional system (FS) are present; 1.5: no disability, but minimal signs in more than one FS are present; 2.0: minimal disability in one FS is present; 2.5: there is mild disability in one FS or minimal disability in two FS; 3.0: there is moderate disability in one FS or mild disability in three or four FS. However, the person is still fully ambulatory; 3.5: The person is fully ambulatory, but has moderate disability in one FS and mild disability in one or two FS; or moderate disability in two FS; or mild disability in five FS; 4.0: The person is fully ambulatory without aid, and is up and about most of the day (12 hours) despite relatively severe disability. He or she is able to walk 500 meters without aid or rest; 4.5: The person is fully ambulatory without aid, and is up and about much of day. He or she is able to work a full day, but may otherwise have some limitations of full activity or require minimal assistance. This is considered relatively severe disability.

> Able to walk 300 meters without aid; 5.0: The person is
> able to walk 200 meters without aid or rest. Disability
> impairs full daily activities, such as working a full day
> without special provisions; 5.5: The person is able to walk
> 100 meters without aid or rest. Disability precludes full
> daily activities . . .

*See* http://www.mult-sclerosis.org/expandeddisabilitystatusscale.html (last visited July 2, 2010.)

Dr. Shapiro rated Dornbusch's EDSS scores as follows over the period of June 2005 through December 2006:  3.5, 3.0, 3.0, 3.5, 3.0, 2.5, 3.5, and 2.0.  (Tr. at 434, 424, 529, 523, 515, 508, 501, 494.)  At each visit, Dr. Shapiro usually made a short note on an "Impression & Disposition Form."  Some of his impressions were:  September 19, 2005 – "not doing as well as she'd like but really doesn't look that bad.  Teary"; October 6, 2005 – "[l]ooks better than sounds, emotional & crying re:  pain & whole situation"; March 21, 2006 – "actually doing well"; August 29, 2006 – "stable"; December 21, 2006 – "paroxysmal spasm."  (Tr. at 535, 530, 509, 502, 495.)

In the meantime, on June 21, 2005, Dornbusch had an MRI of her brain.  (Tr. 436.)  Dr. Larkin's impression from the MRI was:

> Three nonspecific punctate foci of T2 signal hyperintensity
> in the subcortical white matter.  Two of the lesions have
> become apparent since the previous brain MRI of 9/22/04.
> A demyelinating disease is a clinical consideration, along
> with premature microvascular infarcts, vasculitis, Lyme
> disease, sarcoid, etc.  If this does represent a demyelinating
> disease, the T1 and T2 lesion burden is minimal.  There is
> no abnormal enhancement or volume loss.

(Tr. at 436.)  Dornbusch also had an MRI of her cervical spine, which was normal.  (Tr. at 437.)

Dornbusch saw Dr. Sarah Hammes at Rice Street Clinic on October 5, 2005, and complained of mid back pain for the last eight months.  (Tr. 550.)  She stated that the pain was so severe it was like a knife hitting her bone.  (Tr. 550.)  Percocet, which she used for her leg pain, did not help her back pain.  (Tr. 550.)  On examination, she appeared mildly uncomfortable, but could walk without difficulty.  (Tr. 550.)  She was treated with trigger point injections and noted mild relief.  (Tr. 550.)

On November 7, 2005, Dornbusch reported to Dr. Larkin that she had been having back pain, but it resolved with Seroquel.  (Tr. at 547.)  Dr. Larkin noted that she had "intermittent pain that she attributes to her MS."  (Tr. at 547.)  Dr. Larkin also noted that Dornbusch was taking Topamax and Depakote, with improvement in her headaches, but with occasional flares.  (Tr. at 547.)  Dornbusch had a CT scan of her abdomen and pelvis to look for stones, but no abnormalities were found.  (Tr. 560.)

Ten days later, Dornbusch saw Dr. Dean Lee at Rice Street Clinic.  (Tr. at 546.)  Dornbusch had been in a car accident the previous day and experienced right arm pain.  (Tr. at 546.)  Dr. Lee noted that Dornbusch's M.S. symptoms had recently been well-controlled, but with some minimal right leg symptoms.  (Tr. at 546.)  At the time, she had no problems with vision, weakness or coordination.  (Tr. at 546.)  With respect to medication side effects, Dornbusch denied excessive fatigue, sleepiness, or overall energy.  (Tr. 546.)  Dr. Lee noted her gait to be stable and secure with a normal speed.  (Tr. at 546.)

When Dornbusch saw Dr. Larkin in May 2006, she had gained weight from taking the drug Remeron, but it was helping her sleep, and her headaches were much better.  (Tr. at 542.)  Dr. Larkin stated, "[s]he occasionally will have what she describes

as a severe leg pain, which will be triggered mainly by allergy symptoms that responds to the use of steroids. . ." (Tr. at 542.) He also noted Dornbusch had back pain, improved with medication, and she had some memory dysfunction with use of Ambien. (Tr. at 542.) He recommended discontinuing Remeron and starting Trazadone for sleep. (Tr. at 542.)

Dornbusch saw Dr. Larkin for hand and elbow pain on October 19, 2006. (Tr. at 537.) Dr. Larkin's assessment was chronic pain presumed secondary to M.S. and deconditioning, and epicondylitis with question of carpal tunnel versus M.S. (Tr. at 537.)

On November 10, 2006, Dr. Kenneth Britton at the Britton Center prescribed Lyrica for Dornbusch's neuropathic pain. (Tr. at 566.) Dr. Britton noted Lyrica had been very effective in the past, but with side effects at a higher dose. (Tr. 566.) When Dornbusch returned about a month later, she said Lyrica was helpful but made her too sleepy during the day. (Tr. at 565.) She complained of increased pain in the last two days, which Dr. Britton noted was suggestive of acute M.S. flare-up. (Tr. at 565.)

In January 2007, Dr. Britton noted "at her last visit here . . . she had significantly increased pain without a precipitating event," suggesting a flare of M.S. (Tr. at 563.) He noted that Dr. Shapiro had treated Dornbusch's M.S. flare-up with a burst of steroids, which helped significantly. (Tr. 563-64.) Dornbusch also reported excessive daytime sleepiness, resolved when she cut back on Lyrica. (Tr. at 563.) Dr. Britton stated, "[s]he transfers and ambulates independently. There is some mild to moderate impairment in the left-sided function but it is more noted in high-level activities, high-level balance, et cetera." (Tr. at 563.)

Dornbusch was admitted to a hospital on February 10, 2007, with complaints of abdominal pain, lower back pain, and weakness in the legs. (Tr. at 574.) Dornbusch was afraid that if she tried to walk, she would fall. (Tr. at 574.) She said this was her most severe episode, and her right foot felt like it was dragging. (Tr. at 572.) Her medications were Copaxone, Topamax, Depakote, Klonopin, Baclofen, Lyrica, Percocet and Ambien. (Tr. at 575.) A CT scan of the abdomen and pelvis showed no evidence of bowel or renal obstructions, diverticulitis or appendicitis. (Tr. at 577.) An MRI of her head led to the following conclusions:

> 1. Again seen are several small areas of T2 signal abnormality within the white matter of both cerebral hemispheres as well as more confluent hazy white matter changes in the parietooccipital regions. These areas have not changed significantly from 9/22/04 and are nonspecific but compatible with intracranial demyelinating disease. No pathology enhancement followed IV gadolinium.
> 2. No evidence for acute or subacute infarct, hemorrhage, mass or obstructive hydrocephalus.
> 3. There is approximately 1 cm cystic appearing lesion involving right ear lobe region. Correlate clinically. This was not evident previously.

(Tr. at 578.) An MRI of Dornbusch's thoracic spine showed mild degenerative changes. (Tr. at 579.) On neurological examination, Dornbusch was noted to have fairly mild weakness in the lower extremities and reduced sensation distally to cold. (Tr. at 571.) Dornbusch's discharge diagnosis was M.S. exacerbation. (Tr. at 569.) Dornbusch did not have complete improvement of her leg pain and gait disturbance, but she was discharged on February 13. (Tr. at 569.)

Dornbusch underwent a consultative psychological examination with Dr. Donald Wiger on May 16, 2007. (Tr. at 580-84.) Dornbusch reported weakness on her right side, daily headaches, numbness in her legs, and balance issues causing her to fall once

per week. (Tr. 580.) She said she had depression resulting from M.S., and was not depressed before M.S. (Tr. at 580.) Dornbusch reported that she last worked at Fantastic Sam's from September 2003 through May 2004. (Tr. 580.) Her longest job was for 8-9 years. (Tr. at 580.)

Dornbusch reported that during the day, she watched television off and on, and did a few chores. (Tr. at 581.) She tried to go to her son's sporting events, but fatigued easily. (Tr. at 581.) She made simple meals, and could dress, bathe, groom herself, and do light chores. (Tr. at 581.) She had one friend she talked to on the phone. (Tr. at 581.)

With respect to Dornbusch's mood, Dr. Wiger opined:

> It is the opinion of this psychologist that it is not uncommon for someone with MS and being a single parent to have some level of depression. It is this psychologist's opinion that the best fitting diagnosis would be an adjustment disorder chronic, secondary to the stressors of MS and changes in functioning.

(Tr. at 582.)

Dr. Wiger estimated Dornbusch's concentration to be in the low average range, with normal intellectual functioning. (Tr. at 582.) He found no evidence of a somatoform disorder and no evidence of a personality disorder. (Tr. at 582.) He diagnosed "physical factors and other stressors leading to Adjustment Disorder with Depressive and Anxious Features." (Tr. at 583.) Dr. Wiger opined that Dornbusch could understand directions, carry out mental tasks with reasonable persistence and pace, could respond appropriately to other people, and could handle emotional stressors of the workplace. (Tr. at 583.)

On May 14, 2007, Dr. Ronald Shapiro acknowledged that Dornbusch did not reach a listing level impairment for Social Security Disability. (Tr. at 587.) He stated,

however, "given her numerous symptoms and issues, it would appear that she is not capable of working in a competitive workplace, despite not meeting the listing criteria exactly as they are written." (Tr. at 587.)

Dr. Shapiro also wrote a letter on Dornbusch's behalf on October 31, 2007. (Tr. at 601.) In his letter, he stated:

> Kari Dornbusch is a patient of mine who has multiple sclerosis. She is 37 years old and has had multiple sclerosis dating back to the year 2000. This multiple sclerosis has left her with a significant fatigue and, at times, pain associated with it. The fatigue has gotten to the point now that it is limiting her ability to function in terms of doing anything for any extended period of time. With this significant fatigue, she is unable to perform her work as a beautician, and in fact, is really not competitive in the work place. She has been treated for the fatigue, but continues to be disabled by it. There have been many anxieties and much emotional difficulties with her disease process. Her MRI scans have really not looked very severely affected, and her diagnosis was made on a clinical basis. It is my understanding that she is applying for Social Security Disability, and on the basis of her significant fatigue, a decision would have to be made.

(Tr. at 601.)

On November 15, 2007, Dr. Larkin wrote a letter on Dornbusch's behalf. (Tr. at 602.) He stated:

> I am the primary care physician of Mr. (sic) Kari Dornbusch. Kari has been a patient in my practice who I have seen on a regular basis since the early 2000s. She has had issues of chronic pain specifically centered on her back and leg. It has become clear that the symptoms are related to chronic medical diagnosis of multiple sclerosis. She has periods of unrelenting pain as well as paresthesias that seem to respond to steroidal therapy. She sees Dr. Shapiro on a regular basis who is managing currently her multiple sclerosis. She reports good days and bad days for her chronic ongoing symptoms and relates, on bad days, the patient will be laid up, unable to do essentially anything for

one to even two days at a time.  There are times where her
sons need to help her to get dressed as well as to help her to
and from the washroom to use the toilet facilities, as well as
to bathe.  Due to this chronic intermittent exacerbating
medical illness, the patient has been unable to work or
maintain gainful employment.  I have discussed these
symptoms with Kari and encouraged her to apply for social
security disability.  I would suggest that due to the
unpredictable nature of multiple sclerosis and its
exacerbations, the patient would have difficulty holding a
9-5 job.  I would refer to my note from 3/05/2007 to review
atypical exacerbation of the patient's pain related to her
multiple sclerosis.

(Tr. at 802.)

At the hearing before the ALJ on April 24, 2007, Dornbusch testified as to why

she could not work.  (Tr. at 615.)  She testified that most of her problems are with her

legs, they are weak and painful.  (Tr. at 615.)  She stated that she can walk very little

without dragging her foot.  (Tr. at 615.)  Dornbusch testified that if she walks in the

grocery store for 30 minutes, she will have to lie down for two days because of pain and

foot drag.  (Tr. at 616-17.)  She testified that she can stand for 20 minutes at a time.

(Tr. at 618.)  She testified that if she sits, her leg goes numb within an hour.  (Tr. at 620.)

Dornbusch also testified that she has trouble with dropping things in her right hand, but

she can brush her teeth, feed herself, and put on eyeliner.  (Tr. 621-22.)  She also has

balance problems.  (Tr. at 624-25.)  She gets fatigued, and takes two naps or one long nap

per day.  (Tr. at 626-27.)  She has urinary incontinence that comes and goes.  (Tr. at 627.)

Dornbusch testified that she has a flare-up every two to three months where she is

paralyzed.  (Tr. at 639.)  She doesn't always go to the doctor for these episodes, she just

calls the doctor, who puts her on steroids.  (Tr. at 639.)  Once she is on steroids, she can

walk again in three days.  (Tr. at 639.)

A medical expert, Dr. Andrew Steiner, also testified at the hearing. (Tr. 648-56.) The ALJ asked Dr. Steiner if he could explain why Dr. Shapiro's diagnosis of M.S. went from "probable" to "definite." (Tr. at 650.) Dr. Steiner testified that he did not see any actual documentation of the kinds of upper motor neuron findings that would "firm up" a diagnosis of M.S. (Tr. 651.) Dr. Steiner also testified that Dr. Shapiro's notes were confusing where he marked Dornbusch's gait as normal, but her ambulation as impaired. (Tr. at 651.) Dr. Steiner testified "because we don't have any real good documentation of mobility impairment, that the record would point mainly to a light residual, based strictly on the physical diagnoses." (Tr. at 653.) He also added that Dornbusch should be restricted from climbing ladders, and from unprotected heights, due to findings of mild weakness on occasion. (Tr. at 653.)

The ALJ noted that he would send Dornbusch for a psychiatric consultation before making a decision, and he was specifically looking to see whether there was a "12.07" (somatoform) impairment. (Tr. at 653.) Dornbusch's attorney also asked for an opportunity to have Dr. Shapiro explain some of the inconsistencies in his treatment notes. (Tr. at 656-58.) A second hearing was held on August 9, 2007, after Dornbusch attended a consultative psychological examination. (Tr. at 661-78.) Dornbusch also submitted new medical records. (Tr. at 663.)

Dornbusch testified briefly at the second hearing, and stated that she had episodes of actual paralysis, but she doesn't go to the doctor when this happens. (Tr. at 665-66.) Instead, she calls Dr. Shapiro's office and is prescribed a high dose of steroids, and that gets her walking again. (Tr. at 666.) Dr. Steiner testified that the new evidence, including a psychological consultative examination and a letter from Dr. Shapiro, would

not change his testimony.  (Tr. at 670-71.)  The ALJ denied Dornbusch's claim on

October 23, 2007.  (Tr. at 15.)

## II.    ANALYSIS

### A.    Standard of Review

In their cross-motions for summary judgment, the parties dispute whether

substantial evidence supports the ALJ's finding that Dornbusch has the ability to perform

a limited range of light work.  Dornbusch argues the ALJ erred by not giving greater

weight to the opinions of her treating physicians that she is unable to work at competitive

employment.  The Commissioner contends the ALJ reasonably rejected Drs. Larkin and

Shapiro's opinions because they were not supported by medical evidence in the record.

In reviewing an ALJ's decision regarding social security benefits, a court

examines whether the findings of the ALJ are supported by substantial evidence in the

record as a whole.  42 U.S.C. § 405(g); *Scott ex rel Scott v. Astrue*, 529 F.3d 818, 821

(8th Cir. 2008).  Substantial evidence is such relevant evidence that a reasonable mind

might accept as adequate to accept a conclusion.  *Pate-Fires v. Astrue*, 564 F.3d 935, 942

(8th Cir. 2009) (quotation omitted).

When assessing whether there is substantial evidence, a court must consider

evidence that supports, and that which contradicts, the factual findings of the ALJ.

*Hartfield v. Barnhart*, 384, F.3d 986, 988 (8th Cir. 2004).  The ALJ's findings are not

subject to reversal if substantial evidence may also support another outcome.  *Culbertson*

*v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).  If it is possible to draw two differing

conclusions from the record, but one of those conclusions supports the findings of the

ALJ, the ALJ's findings must be affirmed. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

### B.    Evidence from Treating Physicians

Dornbusch argues Dr. Shapiro made a definite diagnosis of M.S., and Drs. Larkin and Shapiro agreed she was disabled by M.S. symptoms. Defendant, on the other hand, asserts Dr. Larkin's treatment notes do not contain any functional limitations, and Dr. Shapiro's treatment records reflect only mild to moderate limitations in one or more functional areas. Thus, Defendant concludes that neither treating physician's opinion is supported by his own treatment notes.

In reply, Dornbusch argues the EDSS scores, upon which Defendant relies in arguing that Dr. Shapiro's opinion is inconsistent with his treatment notes, do not take into account pain, fatigue, weakness and numbness. Dornbusch cites evidence of weakness, disturbed sensation, and impaired ambulation in the Administrative Record. Dornbusch contends that when her fatigue and M.S. exacerbations are taken into account, she would not be able to work.

Although a treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence in the record, an ALJ need not accept the opinion if it does not meet those criteria. *Clevenger v. Social Sec. Admin.*, 567 F.3d 971, 974 (8th Cir. 2009). An ALJ "must always give good reason for the particular weight given to a treating physician's evaluation." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). "The Commissioner is encouraged to give more weight to the opinion of a

specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Keehn v. Halter*, 2001 WL 34155024 (N.D. Ia. March 23, 2001) (citing *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995).

This is a difficult case because Plaintiff has been diagnosed with a serious progressive, relapsing and remitting illness. *See Young v. Apfel*, 221 F.3d 1065, 1068 n. 3 (8th Cir. 2000) (defining multiple sclerosis and citing *Sloane-Dorland Annotated Medical-Legal Dictionary* 632-33 (1987), supp. at 470-71 (1992). The ultimate issue in this case is how severe Plaintiff's M.S. symptoms were during the relevant time period. Plaintiff's subjective complaints are of severe disabling pain and inability to walk on occasions, but her objective findings never indicated such severity, and her severe pain or inability to walk was never observed during any clinical visits. Furthermore, there is some evidence in Dr. Larkin's and Dr. Shapiro's treatment notes, as described below, that could reasonably be viewed as inconsistent with their opinions of Plaintiff's inability to work. Ultimately, because the Court concludes that the record could support two differing conclusions, but one of those conclusions represents the findings of the ALJ, the Court recommends affirming.

Dr. Larkin wrote two opinion letters. His first letter was written in December 2004. (Tr. 319.) He stated, "[i]t is my recommendation that . . . she will be placed on complete disability based on her physical problems, low back, leg pain, upper back, neck pain, and due to her mental condition of depression." His second letter was written in November 2007. (Tr. at 602.) He stated:

> She has had issues of chronic pain specifically centered on her back and leg. It has become clear that the symptoms are related to chronic medical diagnosis of multiple

sclerosis.  She has periods of unrelenting pain as well as paresthesias that seem to respond to steroidal therapy.
. . .
I would suggest that due to the unpredictable nature of multiple sclerosis and its exacerbations, the patient would have difficulty holding a 9-5 job.  I would refer to my note from 3/05/2007[1] to review atypical exacerbation of the patient's pain related to her multiple sclerosis.

(Tr. 602.)

The ALJ found that Dr. Larkin's opinion was inconsistent with objective medical evidence and Dr. Larkin's own treatment records, including examinations in January 2004, April 2004, January 2005, and November 2005.  (Tr. at 26.)  As the ALJ noted, the objective findings of Dornbusch's pain, numbness, weakness, paresthesia and fatigue in Dr. Larkin's treatment records and the administrative record as a whole are quite minimal.

Apart from the nonspecific findings on MRI of her brain that contributed to the M.S. diagnosis, the only objective evidence of Dornbusch's complaints of back and leg pain, weakness, numbness and paresthesia are as follows.  On October 25, 2002, Dr. Hoj examined Dornbusch and found, with respect to sensation, "[s]he has slight alteration, more on the sole of her feet, more so on the left compared to the right to light touch" and "[s]he does have some sensory level changes at approximately T6-T7 level on her truck (sic)."  (Tr. at 298.)  In an otherwise normal examination on December 31, 2003, Dr. Larkin noted, "she has slight decreased sensation in the right leg compared to the left."  (Tr. at 344.)  On December 7, 2004, Dr. Larkin noted Dornbusch exhibited "a couple beats of clonus bilaterally with testing at the ankles."  (Tr. at 327.)  On

---

[1]     The Administrative Record does not contain Dr. Larkin's treatment record of March 5, 2007.  The records from Rice Street Clinic in the Administrative Record end in February 2007.  *See* Administrative Record, Ex. 20f.

January 4, 2005, Dr. Slutsker at the Britton Center noted, "significant muscle spasms in the lumbosacral areas, more on the right" and "some right side weakness, more in the right arm." (Tr. at 408.) Dornbusch was frequently noted to be in no distress upon examination, and her complaints of leg paralysis or giving out were never observed by a physician, even when she sought emergency treatment.

Dornbusch was examined by Dr. Shapiro between June 2005 and December 2006. Dr. Shapiro never commented on Dornbusch exhibiting any symptoms of pain. On September 15, 2005, he noted, "[n]ot doing as well as she'd like but really doesn't look that bad." (Tr. at 535.) On October 6, 2005, Dr. Shapiro noted, "[l]ooks better than sounds, emotional & crying re: pain & whole situation." (Tr. 530.) On March 21, 2006, he noted "actually doing well." (Tr. at 508.)

The forms Dr. Shapiro used to evaluate Dornbusch did not rate pain, but rated muscle tone, coordination, reflexes, muscle weakness, sensation, gait, stair climbing and ambulation. It is not possible from the record to determine whether these ratings were based entirely on objective testing or examination. On all but one visit, stair climbing was rated 2, and ambulation was rated 1,[2] with 0 being normal and four being severely affected; presumably with 2 representing moderately affected. The other categories listed above were rated as normal with the following exceptions: sensory ranged from 1 to 3; and on one occasion over the course of her treatment functional muscle weakness was rated 1; gait was rated "spastic 2" and "ataxic 1;" coordination "finger nose" was rated 1 on the right, and 2 on the left; and "muscle tone legs" was rated 2. Overall,

---

[2]    One of the inconsistencies Dr. Steiner noted in Dr. Shapiro's notes was that although the Follow Up Visit Form rated ambulation as 1, the Neurological Exam Form indicated ambulation was full and gait was normal. This is true for the following dates: June 14, 2005, June 30, 2005, March 21, 2006, August 29, 2006 and December 21, 2006.

Dr. Shapiro's objective findings represent fluctuating minimal to moderate symptoms and functional limitations.

Then, in January 2007, Dr. Britton noted, "[s]he transfers and ambulates independently. There is some mild to moderate impairment in the left-sided function but it is more noted in high-level activities, high-level balance, et cetera." (Tr. at 563.) When Dornbusch was hospitalized in February 2007, and complained of her most severe exacerbation, the only objective findings on neurological examination were "fairly mild weakness in the lower extremities and reduced sensation distally to cold." (Tr. 571.) Thus, there is substantial evidence in the record to support the ALJ's finding that the objective medical evidence overall and Dr. Larkin's own treatment notes do not support his opinion.

Dr. Shapiro wrote a letter in December 2007, suggesting that Dornbusch might be disabled by fatigue associated with M.S. (Tr. 601.) Dr. Shapiro had also written a letter in May 2007, which the ALJ found to be vague and conclusory because it stated that Dornbusch was disabled by her "symptoms and issues." (Tr. 587.) The ALJ found Dr. Shapiro's opinion to be inconsistent with his treatment notes, particularly comments that "she really doesn't look that bad," and "looks better than she sounds." (Tr. at 27.)

Dr. Shapiro assessed Dornbusch's fatigue at each visit, and rated it as a 2 on a scale of 0 to 4. Dornbusch complained of fatigue to other doctors on a few occasions before she began seeing Dr. Shapiro. (Tr. at 243, 345, 408.) However, in some instances, she denied fatigue or stated it was improved. (Tr. 343, 563, 546.) The ALJ accommodated Dornbusch's fatigue in her residual functional capacity by limiting her to routine, repetitive, unskilled work which is not rapidly paced. (Tr. at 28.) The record

supports, at best, a moderate degree of fatigue, and the ALJ's accommodation reasonably addressed this symptom.

## III.    CONCLUSION

In summary, the objective medical evidence of the record as a whole and Dr. Larkin's and Dr. Shapiro's treatment notes provide support for the ALJ's determination.  Thus, the ALJ gave good reasons for adopting Dr. Steiner's opinion over that of the treating physicians.  *See* <u>Michno v. Astrue</u>, No. 07-CV-0381, 2009 WL 3491302 (W.D.N.Y. October 23, 2009) (ALJ gave good reasons for discounting treating physician's opinion that claimant was disabled by multiple sclerosis); *and see Vandenboom v. Barnhart*, 421 F.3d 745, 749 (8th Cir. 2005) (affirming ALJ in denying claim where treating physician failed to document objective medical evidence to support claimant's subjective complaints).

The Court also notes Dr. Karayusuf opined that Dornbusch would not be able to interact effectively with fellow workers, supervisors, and the public due to her emotional lability, and for that reason would not be able to maintain pace and persistence. Dornbusch does not argue that Dr. Karayusuf's opinion should be controlling.  The record as a whole indicates that although Dornbusch had a few instances when she was overwrought, such as the day she met with Dr. Karayusuf, overall her anxiety and depression were mild to moderate, and would not prohibit her from interacting with others.  (Tr. at 408-09, 417, 582, 535, 530, 340.)  The Court finds that the ALJ reasonably granted more weight to Dr. Wiger's opinion that Dornbusch could carry out mental tasks with reasonable persistence and pace, could respond appropriately to other people, and could handle emotional stressors of the workplace.  Therefore, substantial evidence as a

whole supports the ALJ's RFC finding, which was based on the opinions of Dr. Steiner and Dr. Wiger. Thus, the Court need not address Dornbusch's argument that if additional restrictions were added to her RFC, she would not be competitively employable. *See Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001) (vocational expert's testimony in response to hypothetical question containing all limitations the ALJ accepted as true was substantial evidence supporting ALJ's determination of no disability.) For these reasons, the ALJ's decision should be affirmed. Being duly advised of all the files, records, and proceedings here, **IT IS HEREBY**

**RECOMMENDED THAT:**

1. Dornbusch's motion for summary judgment (Doc. No. 8) be DENIED.

2. The Commissioner's motion for summary judgment (Doc. No. 10) be GRANTED.

3. This action be dismissed with prejudice and judgment be entered.

Dated this 9th day of August, 2010.

  s/ *Jeanne J. Graham*
JEANNE J. GRAHAM
United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **August 24, 2010**. A party may respond to the objections within 14 days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.